313-0365 Keith Saginus, killed by Scott Piles, v. Silver Cross Hospital, Medical Center, Ambulance by General M.R. McBride The plaintiff has not properly granted summary judgment in favor of the defendants, Silver Cross Hospital, for what occurred on September 5, 2008. The principal thrust of why the defendants in this case have filed a motion for summary judgment is that after the case had been commenced and the discovery deposition of the plaintiff had been taken, the plaintiff died. And the case, after that point, without the plaintiff still being alive, it was the defendant's position that without the plaintiff in the case, the plaintiff could not present enough evidence to meet their burden of proof by components of evidence that the defendants in this case were negligent in maintaining their doors on their medical facility back on September 5, 2008. There were several other depositions that were taken in this case, and I think that in looking at how the trial court looked at the evidence, it is the position of the plaintiff in this case that the trial court did not give the plaintiff every reasonable inference from the evidence, and did not weigh the evidence in favor of the movement as it should when considering a motion for summary judgment. Well, let me then try to phrase it another way. If this case went to trial, who's going to testify as to what happened? There's going to be several people. Pardon? Well, there's going to be several people. Did anybody see it happen? In other words, who's going to testify how this injury occurred? Well, in the deposition testimony, it's going to be gleaned. Mrs. Saganis apparently was on her way out the door when the doors closed. Who's going to say that? Well, the security guard that arrived at the scene and who was called by the receptionist to indicate that something had happened, Mrs. Saganis was there in the lobby area. The security guard who was called came to investigate. The security guard testified. He asked the receptionist what happened. A lady got caught in the doors and she fell. The security guard went over to Mrs. Saganis and she stated to the security guard after she had fallen, while she was still in the lobby, I was caught by the doors and they thrust me forward and I fell down. Now, the receptionist is out, right? My understanding is that the receptionist was not able to be found. Well, no. The security guard can't say what the receptionist told him. Granted. Okay, but what you have is the security guard at the scene talking to the decedent. Correct. And the decedent said to the security guard, I got caught by these metal doors and I fell. Now, the security guard did an initial check to see, okay, the security guard then took Mrs. Saganis to the doctor's office because they were in the medical building. And he immediately went to the doctor who I guess treated Mrs. Saganis. When they went into the doctor's office... But we have a question here. Okay, I don't want to turn this into a trial, but can he testify as to what the decedent told him? I believe he can. Under two different exceptions. One, it was a statement made that was giving information on the existing, present medical and mental condition of the plaintiff. Why are you lying on the ground? I just got caught by the door and I'm hurt. Okay. Also... But wait a minute. Let me just ask this. So I got caught by... Well, how did you get caught by the door? What did the door do? In what manner were you caught by the door? Were you right over here by the edge on one side? Were you in the middle and they closed? In other words, how did you get caught by the door? Is, I got caught by the door, is that evidence that the door malfunctioned and that caused you to fall down? Justice Smith, if you look at the medical record that was taken, there was two statements made by the plaintiff to the doctor that's in the medical record that indicates that the doors closed on her as she was walking through. And these are the automatic doors. And there's deposition testimony from a Kyle Nelson, who's the director or supervisor for the maintenance at Silver Cross that indicated how these doors function. You walk in, the doors are supposed to open and given time for somebody to walk through without closing on them. And what happened in this case, as Miss Agnes was trying to walk through the doors after they opened, they closed on her while she was still in the doorway. And that's what's indicated in the medical records, because that's what she told the doctor. Because when she went back in to get treated for what had happened, she asked, okay, well, why are you back here? And she says, I was walking through the door and I got caught in the door and it pushed me off my feet and I fell forward. And that's the statement that's contained within the medical record. And I want to point out, it's the defendant's medical record in this case. It's a little bit of an unusual circumstance. Well, let's just say that's true, okay? That by gosh, that's what... I got caught by the door and it knocked me off. Is that enough to entitle her to a judgment? Well, I would say that the door, if you look at the deposition testimony of Mr. Nelson, the idea of the doors, they're supposed to open up when somebody approaches. They're supposed to open up for enough time for somebody to get all the way through. If an automatic door closes while somebody's still trying to get through the door, yes, I would suggest there was a malfunction with the door. It was not operating as the way that it should. And the testimony from Mr. Nelson and from Jennifer Midlock indicated these doors had been malfunctioning prior to this, and that Ms. Midlock had said that she had not only seen people repairing these doors, she had heard other people complain to the receptionist that the doors were closing on me. Now, the trial court in its decision in this case said, well, we're going to discount what Jennifer Midlock says because she didn't personally see any of this. Of course, that's not really the issue. The issue is, did the defendant have notice of the malfunction of these doors? And the answer to that question is yes. Not only did the defendant, because its nurse knew about it and its receptionist knew about it, and that the doors had been malfunctioning and had been worked on prior to the September 5, 2008 date. So the evidence in view most like favor to the plaintiff would indicate yes, they had noticed that there was problems with these doors because they'd only been worked on, but one of the defendant's employees had heard about people complaining about the doors were closing too fast and were catching people in them. Let me ask another question. It was quite some time after the suit was filed that your former client, now the decedent, passed away. How come nobody got her evidence deposition while she was alive? Well, Judge, if you look at the, or Justice Schmitt, if you look at the medical records in the case, actually, Ms. Agones, despite the injury and the fact that she was on Coumadin, was, for being elderly, she was in pretty good health. If you look at the medical records that are contained in the case, especially the ER documentation that I attached in the context of my brief, she was in relatively good state of health. Can we go back to the earlier questions asked by my two colleagues? Who did you say was going to testify with regard to, like, what, you were asked, I think, by Justice Schmitt, how are you going to get a statement about what happened to Orietta? And one of the reasons you gave, and I forget, I didn't hear the other reason, one reason you gave is because, or for medical conditions, correct? There's two places where she made statements that I believe were going to be admissible at trial. One is the statement that she made to the security guard, which I think is a hearsay exception. Not only is it an excited utterance, because she had just something traumatic had just happened to her, and the security guard came up to her after it happened and said, what happened to you? I got caught in the doors, and it tore me off my feet, and I fell forward. And then there's that statement. Also, there's a statement that's in the defendant's medical records at Silver Cross that indicates she gives a very specific description. I was walking out. I got caught. The doors closed on me while I was in the doorway. It pulled me off my feet, and I fell forward. Okay, let's look at the medical statement. Who's going to be on the stand testifying to that? In terms of what the medical record is, it's going to be the evidence. And we can call the nurse or the doctor who took the history from the, that's going to say, did she give you a history about why she was in the office that day? Yes, she did. What was that history? Well, the history was that she stated to me that she was walking through the doorway. The door closed on her while she was in the doorway. It put her off her feet, and she fell forward. What was her injury? A broken hip? Justice, I know I'm looking at her. If I look back at the medical record, I believe that she did suffer a bruise on her hip when she fell. She had a hematoma. She had a hematoma. That's what I remember being. I think that's a fancy medical word for a bruise. But that's my understanding of what the initial injury was. She was in pain. She had a bruising, and she went immediately to the doctor in the building where this took place, and she told them what happened. So I think from two places, you're going to have evidence of what happened. I want to distinguish this between another case that I had. Let me follow up on the reason I'm asking those two questions because to survive a summary judgment, you have to have the elements of a tort. Correct. So you have a statement that she was hurt in the elevator. No, it wasn't an elevator. These are automatic doors coming into the building. The automatic doors. I'm thinking of an elevator door. But anyway, the automatic doors. She's hurt in the automatic doors. But we don't know how she was hurt in the automatic doors. Well, yeah. Actually, it's in the medical record. If you look at this phrase in the medical record, it says the doors posed on her while she was in there and lifted her off her feet, and then she fell forward. That phrase is right in the medical record after she had fallen and asked. It was a history taken by the doctor. Now, in the trial court's decision, and where I think there's an issue here, is that the trial court was weighing the credibility and making determinations on the evidence on the summary judgment stage. He, in the trial court's decision, indicated, well, yes, there's a medical record that indicates what happened here. We know what happened to the plant because it's in this one section. However, the trial court also said, well, but I don't know if the medical records are all that reliable because in another section in the nurse's note, it indicates that Ms. Sagan has tripped over a dog. Yeah, now that's intriguing to me. Is she blind? Does she have a companion animal? I mean, where does the dog come from? Well, that's just it, Justice Holdridge. As I pointed out in my brief, I think that's just some sort of a Scribner's error. Again, I don't know. Similar to what Justice Carter, confused it with something else. Well, I thought it was an elevator. It was actually an automatic door. A dog caught in a door tripped over a dog is a Scribner's error? I'm saying that the fact that in one history, in one record that the plaintiff tripped over a dog where there's no mention of a dog anywhere else in any of the records of any other testimony, I would submit to you that was an error. And I think that frankly... Who's error? The medical provider. The nurse that prepared the medical record made an error in the history. Well, but the defendant can't... Here's the problem with this. If this were... And then you could cross-examine them on that. But to be fair, how does the defense cross-examine as to, well, which of these are both... At one point it says you said dog, and here it says you said door. Well, which was it? And if you're saying now it's door, why did you say dog? I didn't say that. Or something like that. In other words, don't you deny the defendant a right to cross-examine, which is the heart of any trial, generally anybody, the truth-seeking process, cross-examination. The one person that really knows what happened can't be cross-examined. And you want to just put before a jury favorable testimony and then say, well, if they put the other thing in, jury can decide which is the most credible. Well, how do they do that? Well, Justice Spine, I would just suggest this. I don't think that the defendant is going to be cross-examining their own people. Let me repeat that. This is the defendant's medical records at the defendant's facility. The defendant's doctor, employee, whoever the doctor was that day that took the history that indicated that she got caught in the medical records doors, that is the defendant's employee and his statements made in the defendant's medical records. This is not a third-party situation where we've got a doctor that's off-site. This happened. These statements were made. There's no evidence anywhere. There's a dog. I mean, this apparently, poor lady goes to the hematology department probably for a blood test because she's on morphine therapy and is leaving the hospital. Is there any evidence she's blind and has a dog? No. Is there any evidence that she has a companion animal with her? I can't imagine them letting a dog in a hospital. No. So this dog thing is really intriguing, but door hits her, goes to ER, and a medical history is taken. Am I correct? That's correct. And the medical history that you're talking about says I was hit by a door leaving the hospital. I was... I don't care the mechanics, but the general thing is a door hit me, your door, defendant's door hit me, and that's why I'm here. That's right. I was going through an automatic door. It opened. I attempted to walk through. It closed on me while I was in the door, lifting me off my feet and falling forward. Let me rephrase the question. I'm trying to understand. So let's assume she got hit by a door, an electric door. Is that Ray Zipsa? I mean, is... Well, I mean, are we talking Ray Zipsa? That's all she... You know, I got hit by a door. The thing speaks for itself. The defendant's responsible because I got hit by an electric door. I don't necessarily say it was Ray Zipsa. No, it's not. Because... How did he get there? Well, you have a testimony... You have the testimony of the director, Kyle Nelson, who testified that the doors were... that he had to work on the doors that they were not functioning. Should we take judicial notice of the fact that when somebody walks through an automatic door, it shouldn't close on them while they're still in it? I mean, frankly, I mean, that's the purpose of an automatic door, and I... I mean, I'm trying not to take the obvious here, but, you know, when a door opens, you know, the automatic door is not supposed to close while the person's still in the doorway. Well, we all get on elevators every day, right? And elevators have electric doors, and they come closed, you know, with so much time, but they're not supposed to squeeze you and the elevator's not sitting there, so you can get touched by elevator doors. It seems to be a pretty common experience that elevator doors close with people in them every... all the time. It happens. It happens in my building every day. I'm guessing that hospital has elevators, and elevator doors come closed while you're in there, but then it hits your hand or something, and it's supposed to open again. You see some where they do malfunction, you catch somebody in there, and away they go. Not very far. But if... I'm just saying, without... Wouldn't it be fair to know exactly how this injury took place? I think we have a pretty good idea what happened, because... Well, let's talk about those doors, because that intrigues me, because, yes, an elevator has a bumper bar that then deactivates and it retracts. But you're talking about doors that open in a foyer going out. Right now. Correct. Those don't have that normally. Do we have any description? No. What keeps them open so they don't hit a person is arguably a seeing eye, like you have in a garage door. Like a sensor, or some sort of a sensor like that. Right. So they're not supposed to touch you, whereas an elevator door is designed... It doesn't touch you, but it doesn't hit you, or squeeze you, whereas these doors are not designed to touch you. Correct. And there's a lot of testimony about the mechanics of these doors given by the director, Kyle Nelson, in his deposition. Well, it wouldn't be mechanics, because this would be an electronic... Right. We're talking about the operation of the door, how the door operates, and how the door is to not hit or squeeze someone. Do we have, or do you have, any evidence on that? I think that there's evidence from Kyle Nelson that talks about the operation of the doors, yes. In fact, he indicates in there that they had to perform maintenance on these doors, and then you have the complaints that they were closing on other people, as witnessed by Nurse Jennifer Midlock, another one of the defendant's employees. I guess I just want to... Would it not be about a race case, though? Because if these doors are not supposed to hit people, and I was hit by the door... I mean, yeah, I think that there is a race, there's a quality to this. I think it's more than that, but I think that it could fit in that, too. I want to emphasize, though, and why I say that the trial court error here is that I don't have to prove my entire case at the summary judgment level. All I have to do is... Go ahead, you can finish. All I wanted to say was that at the summary judgment, I've got to present some evidence that I can satisfy the three elements that are demonstrated in the Madiget's case that was decided by this court that I was in that I'll talk about in rebuttal on why the Madiget's case is different from what we have in this case, where in Madiget's the court upheld a summary judgment on a situation somewhat similar to the premises liability on an elderly woman, and I'll talk about that in rebuttal. I'd ask that you reverse the judgment. We've been asking a lot of questions, so you can... Well, if need be, we'll give you... Which case are you referring to? Madiget's v. P.T. Farrell. Where do you cite that? It is in the beginning paragraphs for the standard. I mean here in your points and authorities. It should be in the first argument section. Madiget's v. P.T. Farrell. It's the 3rd District Appellate Court, I believe, 2009. Yeah, please read this on page 1011. Okay, thank you. Is that right, Dad? Actually, I believe you did. And in that particular case, I represented the defendants in that case. Working both sides of the canal? That's good. I'm sorry. Was that wrongly decided, or would you want to distinguish it? No, I would distinguish it. I would never say that the case that I won was wrongly decided. I would suggest that Madiget's was correctly decided, but the facts in Madiget's are a lot different than what we have here. Okay, all right. Thank you. Ms. O'Brien. Thank you, Your Honor. And in the sake of fairness, if you need a couple extra minutes, you'll get that, too. Oh, thank you, Your Honor. The trial court here correctly entered summary judgment in favor of Silver Cross Hospital. In Ms. Netherton's case, where there were no witnesses to the plaintiff's alleged accident, and there's no admissible statement by the decedent. The plaintiff doesn't have to prove his case on summary judgment, but in order to defeat summary judgment... Let's go with that no admissible statement by the decedent. Yes, Your Honor. He's suggesting it was. No, Your Honor. The trial court excluded the decedent's discovery deposition, and that issue is not before this court on appeal, so there's no deposition statement. Now, what counsel is referring to... No, no, no, I'm saying that we've got the security officer here. Yes. And we've got a medical record that states what happened. I would like to address both of those, Your Honor. Aren't those statements by the decedent? Well, first of all... Why are they not admissible? They are statements, and they're inadmissible. Oh, they're inadmissible. Why are they inadmissible? Well, I'll start with the security guard. That statement was made to Mr. D'Elia. He was the hospital's security guard for about 9 years, and he was very familiar with the doors. Mr. D'Elia was called after Ms. Sagenas claimed that she fell while she was leaving the Joliet Oncology Office. Okay, now, she went through at least three doors in order to leave that office. There was the door to the office itself inside the medical building, then there were some inner sliding doors, and then there was an outer set of sliding doors. So when Mr. D'Elia came to assist the decedent, she said something to the effect of, I fell going through the door. And when he was questioned in his deposition about that statement, he said, I don't remember the details other than she said she was injured by the door. That's on page 358 of the record. She didn't say that she fell coming out of any particular door. She didn't say that the door caught her as it was closing and squeezed her and pushed her forward, according to Mr. D'Elia. All he remembered was she said she was injured by the door. He didn't even remember her saying that she fell down. So there is no statement through Mr. D'Elia, even if his recollection, his recounting this, were admissible under some exception of the hearsay rule, there's no statement that corroborates that. Why? I mean, he said there would be an exception that would be admissible. I believe what counsel argued is that it would be admissible under the excited utterance exception. Well, it's not admissible under that exception because it wasn't a statement that was related about a startling event while the declarant was under the stress and excitement of this startling event. Mr. D'Elia spoke with Miss Sageness after she left the oncology office, walked back in, sat down in a chair, and waited for Mr. D'Elia to arrive. That is not admissible under the excited utterance exception. There wasn't the spontaneity. Mr. D'Elia wasn't there when the accident happened. He wasn't there when she was under any stress or excitement of a startling event. Now, there's a lot of different case law about how long it has to be after the event when it's still going to be an excited utterance. Yes, Your Honor. But even if it was an excited utterance, all you have is—I'm correct, right? All you have is that there was harm because of some door. Right. Okay. Without any detail. Now, when we're talking about this specific statement, there weren't any details about what happened. It's just that some doors caused the injury, right? Yes. What Mr. D'Elia recounted was the decedent said, I was injured by the door. That's it. And so there's nothing more or less. Right. So there was a door injury. As to the other statement, am I correct? The other statement is an attempt to get— that you can allow statements in as an exception to the hearsay rule. If it's used by a physician for medical diagnosis and so forth. Correct? Correct. Your Honor is referring to the medical records. Medical records can generally come in under the business record exception with a proper foundation. But in this case, the plaintiff made no attempt to even lay that foundation as a business record. He just attached the records to his response to our motion. But in this case, the business record exception wouldn't even apply because the records are so internally contradictory and untrustworthy. The tripping over the dog and then falling on the door. Where was this dog thing again? If you look at that record, what is in the record? Is there a statement taken that she made during the intake to the emergency room as to what happened? There are two statements. There are about 10 or 11. Well, what's the one closest in time to the incident? Which is usually given a lot more credibility. I believe she states first that she tripped over the dog, Your Honor. The first one was I tripped over a dog. Yes. And then there's a later statement in the record. And she says that she—here's exactly what the record says. Patient P.T. states she was walking through door and the weight of the door caught her and pushed her forward off her feet. The weight of the door. Right. That's all. It doesn't say that sliding door squeezed her. So in other words, and you described this scene earlier as she left the hematology office and went through a conventional door. I believe that's the way the setup was, Your Honor. And then there's a set of doors that open, sliding doors, and another set of sliding doors. Correct. And if one were to say, okay, what kind of door could push her, a door that's a conventional door could push you, can't it? It's a common occurrence. You open doors and you try to walk through them. The door comes back and hits you. Oh, sure. Which would explain being propelled forward. I would agree. That would definitely be a scenario. So that could be what happened as well. Oh, yes. Okay. Well, and these records are so internally inconsistent that you can't just have a records keeper come in and say, yes, these are the records that we keep in the ordinary course of business. What is so internally, what we have is one inconsistency, not so internally consistent. Then we have a statement saying I was with the door statement, and then we have a statement about tripping on a dog. Yes, Your Honor. It's the door versus the dog. So we have two separate statements as to why I'm here in the emergency room. That's correct. And that's all we have. That's correct. And that's why Judge Anderson said that these records didn't come in under the business record. Well, how many records are there? I guess that's what I don't understand. Was this one intake record, or was this an intake record that contained some information and then a record taken by a, was she admitted to the hospital? I don't believe she was, Your Honor. I think it's just the emergency room records that were given. Then a nurse interviews her again, or? Right. I believe it was two different people that recorded these statements and the records. One might have been the nurse and one the doctor. So who recorded the message that the doors hit her? Who recorded that message? I don't recall whether that was a nurse or a doctor that recorded that, Your Honor. And could the nurse or doctor testify, as an exception to their service, that they were told when the injured person came in, the doctor said what happened since I was hit by the door? I think the point is, Your Honor, is that there was no testimony before the trial court from a nurse or a doctor or anyone else who could recount what happened during this accident. Hence, the plaintiff could not put forth any evidence to support the elements of his negligence claim. Let me ask this. What's our standard of review in reviewing the trial judge's decision to exclude this evidence? I believe it's an abuse of discretion, Your Honor. The standard of review on the motion for summary judgment is, of course, de novo. However, when you're talking about whether or not the trial court correctly excluded evidence, I believe you need to apply the abuse of discretion standard. In the summary judgment case, right? I think it definitely would go to the exclusion of the plaintiff's deposition. That's not the issue before the court. I would submit it should be applied for. Didn't he say if it went to trial, he wouldn't let those medical records in and that he wasn't going to consider the medical records? I believe what Judge Anderson said was that these records could not come in under the foundation that was laid for them. Next thing, in the discovery deposition, was there apparently, counsel says that she's in good physical health, but in the discovery deposition, was there a question about this woman's mental acuity? Well, there was, Your Honor. Yes, there was, but the discovery deposition was excluded by the trial judge. Right, but I'm saying in that discovery deposition, was there evidence that her memory wasn't what it could be? Evidence of quite a bit of confusion on her part about things? Well, certainly there was evidence in her son's deposition that she had been diagnosed with dementia or predementia of some form. Mostly, I think that evidence came in through Keith's deposition, who's the administrator, and the deceased's son, that she had short-term memory problems, that she had dementia, she suffered from macular degeneration. The lady was 90. She was doing pretty well for 90, but she had a lot of health issues, and he testified that she couldn't remember on certain days what she had done earlier in the day. So there is a lot of evidence that was before the trial court about her incapacities in that respect. But let's count up the evidence. We've got her statement, apparently, if we can get in, made the security officer a door, and we have an intake medical record that talks about a door versus some statement about a dog. And there's absolutely no evidence there's a dog in the area. Well, Your Honor, let's just say all of that comes in. There's absolutely no evidence that the plaintiff has brought before the court about notice to Silver Cross Hospital about any unreasonably dangerous condition in these sliding doors. There is no evidence. Except your opposing counsel is going to say, yes, I do. I have work records showing that there's been work on these doors. Well, Your Honor, I believe that counsel really glossed over what that evidence actually is. Mr. Nelson is the director of building services for the hospital, and he's the one who testified about the maintenance on the doors. He supervises and maintains all of the buildings, and that includes inspecting these doors on a weekly basis. His personnel does that. And what Mr. Nelson said is that the doors are inspected every week, and if any of his personnel ever finds a problem with them, they repair it and they write up a work order indicating what was done. If they have to call in an outside contractor, then the outside contractor writes up a work order. Now, we produced all of these work orders for the time period before the alleged accident and then the time period after. So these are the work orders that Mr. Piles was referring to. Counsel, I see that. Thank you. Not one of those work orders had any sort of repair having to do with the doors closing on anybody. There had never been a complaint about that to Mr. Nelson or Mr. D'Elia or anyone else, and the closest work order in time to this alleged accident was one year prior. And what was done at that time is that the guides and the anti-risers were repaired. Mr. Nelson explained that that was a problem that would prevent the doors from opening, not that they were closing on people. So there was no notice to the hospital at all that anything like this was ever happening. Well, there was a November 12th work order where he replaced all the safety beams, which I assume are the beams we're talking about that open and close the doors. What precipitated that? I don't think Mr. Nelson gave any detailed testimony about that, but that was after the accident, Your Honor. Oh, so they just did it in response to the accident? I don't know. I don't believe Mr. Nelson gave any details. But that work order does not evidence any notice to the hospital prior to the accident that there was any problem with the doors. And there's no evidence at all that the doors were in an unreasonably dangerous condition. The hospital has... You know, the plaintiff has to prove that the hospital knew or reasonably should have known about an unreasonably dangerous condition and that the hospital failed to protect the decedent from that condition. No evidence to support that whatsoever. We're talking about evidence about the mechanics of what happened when the decedent fell or was injured, and I submit that we don't have any evidence about what happened. The plaintiff can't even prove how the injury occurred, much less that the hospital should be held responsible for it. And that is why Judge Anderson entered summary judgment in favor of Silver Cross Hospital. And we're asking that Your Honors affirm that judgment. No further questions can be done, then thank you. Thank you, Your Honor. Mr. Piles? I want to address the short-term memory problem issue that was raised. I would direct to the court... I'm sorry, I don't have a record site. I have a page of the deposition of Keith Saganis. It is on page 8 of his deposition. He has asked a question, a series of questions, about short-term memory issues at age 15. Other than some short-term memory issues, does she have mental-type issues going on? Answer, no. Question, when did she start seeing she was having some short-term memory problems? Answer, it was when her sister died in 2009. It was November, I believe. So the short-term memory issue, that is something that occurred over a year after this incident took place. So when Tom's talking about the short-term memory issues, about what she remembered what happened at the incident, the short-term memory issue is something that was going on after this incident took place. What did the security guard actually testify to at the record at C-358? This is on page 10 of Larry Delia's deposition. Line 5 on page 10. And what did she say to you and what did you say to her? Answer, I don't remember the details other than she claimed she was injured by the door. That's all I remember. Question, how was she injured by the door? Answer, she claimed the door slammed on her as she was exiting. So that's the testimony of the security guard that is in the record. But apparently, given opposing counsel's description of the scene, when he is talking to her, she is seated in a hematology reception office, a reception area of the hematology office, and there are three doors, a conventional door and two sliding doors. Do we know which door? Based on the two statements we have, we don't know which door it was. We don't know if it was the outer automatic door or the inner automatic door. Or the door... I don't think the door, the swings open in the doctor's office is what we're talking about here. The door slammed on her, and we're talking about the sensors. And again, there's descriptions from the security guard as he checked on these doors after Ms. Sagan has talked to her. And there's deposition testimony talking about what he looked at. It was the east side doors, and he did look at the doors. Now, his testimony was that, well, I didn't see anything wrong with them when I looked at them. But in the deposition testimony, the security guard is very specific. He looked at where the doors were. As to the allegation that Silvercross had no knowledge of what happened, we're disregarding the testimony of Kimberly Midlock, who is the defendant's nurse. She indicates and gives evidence in the record in her deposition. Specifically, she would recall people would be walking to the door and sometimes they would start to close before they got through. And that was a statement that she heard that somebody made to the receptionist. And again, this is not really classic hearsay, because we're not talking about whether or not the actual fact took place. We're talking about notice. Did the defendant have notice that there was problems with these doors? And if you look at the testimony of Kimberly Midlock, she goes through and indicates not only were there complaints about the doors, she saw the doors being worked on. She saw the doors being worked on on multiple occasions. She heard complaints of the receptionist that the doors were not working. And this is all before the incident. In fact, Kimberly Midlock says that Ms. Saganis indicated to her that the doors had malfunctioned on an occasion prior to September 5, 2008. Silvercross had ample notice that there were problems with that door, and that's reflected not only in the testimony of Kimberly Midlock, but on the repair orders and the evidence that Mr. Nelson gives us. If you look at the testimony here, the trial court made some evidentiary rulings in the summary judgment motion without a hearing. He decided, or the trial court decided, these records are inherently reliable. Well, there was no hearing about it. And I just want to say, I find it incredible that the counsel for Silvercross has indicated that Silvercross's medical records are so inherently inconsistent. Well, that's not what they're saying. They're saying you've got two inconsistent entries in here. Which one is it? And so it's on... I don't think they're saying there's anything inconsistent about our records. They're saying inconsistent entries on what statements of the decedent as to what caused her to fall. And I agree with that, Justice Smith, but the problem is that these medical records are Silvercross's medical records. It doesn't make any difference. So what? You've got... But at one point, somebody says, a woman says she tripped over a dog, another entry says door hit her, and something like that. Now, if you've got a witness who's alive and can explain that, but how do you do that? I mean, the fact is, the door may very well have caused it, but you see, if there's nobody to testify as to what happened, that makes it a little unfair, don't you think? I disagree. They are Silvercross's medical records, and I'm looking at the record. This is the ER physician documentation. So this is the doctor that's taking the history that indicates mechanical fall in doctor's office. And then there's a description of why she was there, getting her Coumadin level checked. Then patient states that she was walking through the door and the weight of the door caught her and pushed her forward off her feet. And that statement is Coumadin. At the doctor's office, not at the hospital. Right, but this is the doctor's office in the building. She went back to the doctor who treated her that day and went right back to that doctor and said, well, why are you back here? Well, I got caught in this door. What door was that? That's mentioned in that report you just read. In the report, it doesn't indicate which door. See, this is the problem. Once I get the description that there are three doors, two doors are sliders, one door is a conventional door, I don't see how a slider door pushes you forward. But I do see how a conventional door, closing on your rear end, can push you forward. Well, Justice Holdren, all I can say is that if you look at what the record indicates of what she described happened, that is what she's indicated, and it's corroborated by what she told to the security guard, that the weight of the door caught her, pulled her off her feet, and made her fall. I'm sure to the court, you find your plaintiffs as you find them. This was a 90-year-old woman that came to her doctor's office. I think that she can reasonably expect to be able to get in and out of the doctor's office without getting slammed on by the automatic doors. But here's the problem. If you have her alive there, but you want to go in front of a jury and say, with this evidence, it's going to boil down to whether they like your tie better or opposing counsel's tie better, and who they feel sorry for or don't feel sorry for, because there's just not enough evidence here to point out you want to take the most application. On a standard summary judgment, you want everything to constitute in your favor. In a normal case, that's right. But I also think with the trial judge saying here, you can't put this in front of a jury because they're left with nothing but speculation. And they don't have one person saying, this door hit me and knocked me down or saved a witness. I saw this door hit the decedent, and this is what happened. And she was in there, and it was clear that door malfunctioned, and something like that. It's just, for lack of... And if you don't have evidence to put in front of a jury, how are they going to rule on this case other than just pure speculation? Judge, I don't think that they're going to have to do that. And here's why I say why. Number one, there's not really a dispute. I mean, I understand that we didn't know if it was the inner or the outer door, but there are two sets of automatic doors on the east side that are talked about. And if the question is, which set of doors malfunctioned and she was the way out, I would submit, I don't think that's a difference without a distinction. One of the two sets of automatic doors slammed on her and made her fall. And I think that it's pretty clear that somebody walking through those doors, and we're talking about the automatic doors in the lobby because the security guard gives a description, and he talks about where the doors were, where they were located, because he looked at them after Ms. Sagan has talked about it. We're not speculating on where this happened, and we're not also speculating on what happened, and that's why I want to draw a distinction to the Banaghes case if I could. In Banaghes, this court decided after the trial court had granted summary judgment that there wasn't enough evidence to determine what had happened. And what had happened in Banaghes is a lady had drove into a parking lot that was being under construction by P.T. Farrell, and it was owned by, I believe, Town & Country Plaza. The woman got out of her car and was trying to go in and make some photocopies, I believe at a Kinko's. By the time that she got out of her car, by the time she made it into the photocopy, she came into the store, and she had a bruise on her forehead, and she had talked and was joking with the people in it, where were you? Because she had fallen. And the next thing is, she left the coffee shop, and she was found dead in her home several days later. Now, the plaintiff in that case admitted that summary judgment should have been granted. And the reason it was granted and was affirmed by this court in that case is because we really didn't know what happened to that lady that could possibly be negligent. Could she have fallen on her own or got hit by her own car door? Was the step too high? We didn't know. And that's why I argued in that case that summary judgment was proper. And that lady was not around to testify either. And this court did look at that, and I believe Justice Finchley did write that opinion. However, in this case, we know what happened. She was there. She was walking out the automatic doors in the library where the reception was. One of the doors closed on her as she slammed on her. We're in the deposition testimony of what she told the security guard as she was exiting the building. And we know where it was, so we don't have to speculate on where the doors are because the security guard tells us where she pointed because he looked at them after she went through as he should have to make sure it wasn't something very seriously going on. She pointed to the doors? Pardon? Where she pointed? She pointed to locate the doors for the security guard? The security guard went and checked the doors after she had fallen to make sure that they were working okay. You just said she pointed to the doors. That's why I was just... This is new evidence. Okay. I don't know why she said she pointed, but somehow the security guard got the gist of where to look and where she'd fall because he testifies that he went to go look at the doors to see if there was a malfunction. So we do know where the doors were and he got an indication. We know where the security guard went and he may, like some people, like most of my exercise, jump into conclusions. And so he may have made that assumption. And like I say, I don't think she pointed to them. And that's why I'm saying you've got so much here without her. Like I say, if she were here to explain inconsistencies, but without her... I would say this, Justice Smith. I think that in the summary judgment stage, and I understand trial. We've probably got a rough road, but we're not at trial here. We're at the summary judgment stage. And I would submit to you at the summary judgment stage that we have enough. We don't have to prove our case at this stage. We just have to show some evidence. And that evidence that we have is that this lady was at her doctor's office. She was attempting to exit her doctor's office through the automatic doors. As she was walking through, they closed on her, knocking her to the ground. Why have two sets? There were two sets of doors. We don't know which one. There were two sets of automatic doors. And I'm not saying I haven't seen these particular doors, but sometimes they have two sets. One to keep the cold air out, so one opens. You get out into that area, and then it closes, and then you open it up to see if there's hot air or cold air. And I would submit to you, Justice Carter, that's a distinction without a difference. Which set of automatic doors that were located at the west side of the building, the fact of the matter is that this lady had a right to go to her doctor's office without a set of automatic doors slamming on her. Which ones were being repaired before? All four? You left out one key factor in your primary case, and that is that the doors were malfunctioning, and it was because of the defendant's fault. They knew or should have known that the doors were malfunctioning before the incident. So without knowing which door, how do you get there? Well, Jennifer Midlock, the nurse, that, you know, Justice, or that, you know, the trial court indicated, she said that she had seen people that were complaining about these doors, that they were closing on people, and she had heard people, the receptionist, hearing complaints from people that the doors were malfunctioning. And that Nurse Midlock had also testified that the decedent had talked about that the doors had closed on her before. And that's in Jennifer Midlock's testimony. Both sets of doors? Both sets? I don't think she got slammed on by... No, no, no, I'm saying that they say it malfunctioned. Both sets malfunctioned or just one set? Just one set. She went through the same way. Okay, so one set's malfunctioning. And the repairs, are they on both sets or one set? Justice Carr, I'm sorry. I can't... The records, they're... I don't know what the content of the repair bills are. I know that there are some in the record. I don't know what set of doors we're talking about. I think that in terms of where the repairs are, we still have evidence that the doors were malfunctioning. And we're talking about the notice factor here. And the trial court, I think, improperly did not consider... Is all of the evidence of the malfunctioning of the doors, is it all admissible or are there some problems with it? Well, the trial court discounted Jennifer Midlock's testimony because she didn't personally observe this. And I would state to you that Jennifer Midlock hearing people complain about these doors to the receptionist, that's not prohibited by the hearsay rule because I'm not essentially saying that on that particular day, that person was complaining to the receptionist that the doors were actually malfunctioning. My point is that the nurse heard that somebody was complaining about the condition to the doors to an employee of the defendant. That, to me, would give the defendant notice that the doors were malfunctioning. And that they were malfunctioning in the same way in this sentence. If admissible. I would say that it is because it goes to notice. It is not blocked by hearsay because I'm not necessarily suggesting that the statement that she heard was for the truth of the matter asserted. I'm suggesting that it's admissible for the purposes of notice. That she heard... Who's the notice given to? The receptionist. The defendant's employee, the receptionist at the front desk that monitors where the doors are and is the defendant's ambassador to everybody that walks into that office. So the nurse is standing next to the receptionist and hears people complaining? Yes. That's what the nurse testified. She was out there. It's not a big, huge... It's not the Silver Cross Maine Hospital we're talking about here. We're talking about one of the doctor's offices. This lady went in to have her blood checked at her doctor's office. And that's where this occurred. And these automatic doors are in the doctor's office area. And as she was exiting after she left, one of the set of automatic doors slammed on her. And in talking about what the notice was, Jennifer Midlock, one of the defendant's employees and nurse testified that she had heard people complain that these doors were slamming on other people. And is that the reason that there was repairs to these doors? Well... I don't know if that's the case, but we're talking about notice here. And I believe that testimony is admissible as the purpose of notice. Because it's not necessarily going to the truth of the matter that was asserted. It is talking about whether or not the defendant had some notice. I don't think Jennifer Midlock had some notice of it, because she testified that she saw the doors were, you know, that she had heard that the doors were malfunctioning. She's a nurse and a defendant. She could have said, hey, you know, patients are getting slammed on by these doors. Can we say with any objectivity that the doors that they were complaining about, the doors that were being worked on were the same doors that she complained that she got hit by? Well, Justice Carter, I think you may have me there because I don't know specifically, I don't remember the details of the specific invoices. I would say this, though. There is a description of which doors that we're talking about that the security guard, Larry Delia, looked at. And that the repair notices, I believe, are the same doors, because my recollection is, during the testimony of Kyle Nelson, that they were, in fact, the same doors. The director of maintenance services does talk about the fact that these same doors were being repaired, but that at the day of the incident, there was testimony from the security guard that they were working okay on that day, but that the repairs had been done earlier. I would suggest to you that that's enough notice that there was a malfunction that a trier of fact should sort out. Just as a trier of fact should sort out whether or not the dog statement in the medical records that, well, isn't corroborated by anything else in the case, and why I think an evidentiary hearing should have been held, it's whether or not these medical records should get in because you're going to have all the testimony from everybody else that's saying that there was complaints about the doors. Not about a dog. There's one isolated incident in one of the defendants' medical records that indicates a dog. The testimony from the security guard and the notations in the medical records taken by the plaintiff indicated that she was injured when an automatic door slammed on her, causing her to fall. Now normally when you have that approximate cause testimony from the doctor based on hearing what happened, approximate cause, I was in an automobile accident and so they tell the doctor and the doctor says she was injured at the automobile accident. That's because the doctor's testifying about the approximate cause. I've discovered these injuries. She told me that she was hit by another car and that's the relationship. Right? It's the doctor testifying to that. But the doctor doesn't get to testify even if she said it. Oh, she said that this car ran a red light and hit her and did that. He can testify only to that which is necessary for medical treatment, right? And whether the other car ran a red light has nothing to do with that. So you usually can't get that testimony in through the doctor because they say wait a minute, that's got nothing to do with whether she's got a broken leg or something like that, the mechanics of the accident. But the doctor can't testify about her statements about legal fault she makes in his office. Justice Spence, with all due respect, I disagree with you because in my experience, for purposes of hearsay rule, statements made by a patient to a doctor are statements for the purposes of medical diagnosis. For example, you talk about a situation about the mechanics. I think a lot of times the mechanics of what happens to a patient is very important in making a diagnosis of what happened to the patient. For example, in this case we had some bruising on the hips or the hematomas talked about. She made a statement, well the door slammed on me. The doctor using that... She told the doctor the door knocked her forward, didn't she? I want to be extremely accurate in what I tell the court. I have a medical record right here in my appendix. I want to read the statement so that I'm absolutely clear on what was in the medical record. And then after you do that, I'm going to ask you to close because we're having great fun here. We've got a courthouse staff that have families and would undoubtedly like to go join them for dinner. I apologize. I don't want to take up the court's time. We're not going anywhere. Patient states that she was walking through the door and that the weight of the door caught her and pushed her forward off her feet. That is the statement that is in the emergency physician documentation, which is the history that the doctor was taken. Not a nurse. You're saying doctors are more credible than nurses? I'll send my wife over to your house and have a chat with her. Well, no, I'm not suggesting that, Justice Smith. I'm just thinking that I think for purposes, I think the doctor if he's sitting in there and he's taking a patient, he's writing down the stuff as it's being taken down. Isn't it really more relevant to talk about closest in time to incidents? So is this the record that was taken? The information closest in time? Justice Holdridge, I agree. I would submit to you that this is the record. She saw her right after this happened. The doctor went in and Well, I'm wondering if one looked at the records. Can you determine which is the statement closest in time to the incident? Because we've got this dog out there somewhere. And where it appeared from and why, I have no idea. Scrivener's error is a possibility. Some short-term memory loss is a possibility. Well, I don't think the short-term memory I don't want to go there. I'm just saying those are possibilities. So we're talking what's closest in time? I don't know the timing on the other medical record. I will acknowledge the court that in looking at the record that is contained in my brief, there is a time. I trust you. We have the record. We will have every opportunity to make that determination. And you are not requesting that we reverse the trial, Judge, correct? Well, I'm requesting that you reverse the trial court. Because I think the trial court made some evidentiary rulings without the benefit of a hearing. Suggesting that he wasn't going to consider the medical record statements because he thought that the records were inherently unreliable. I think we should have had a hearing on that issue before he made that ruling. When we had the summary judgment motion, there was no discussion well, you know, should we have an evidentiary? I could have called a witness that could have corroborated the statement that was my side, or what I'm saying happened in this case. I could have called the security guard. Did she make the statement? Yes, she said she was caught in the door. That would corroborate with what's in the medical record. Did you point that out in the motion to reconsider after the summary judgment? We didn't do a motion to reconsider after that. I don't believe. Okay, alright. Thank you all for your arguments here today. The matter will be taken under advisement. A written disposition will be issued. And right now the court will be in recess until 9 a.m. tomorrow. Clerk's right. This court stands at recess and is stated.